## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jun 16 2015, 9:50 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Joann M. Price
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of: M.Y. and M.Y. (Minor Children),

J.P. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

June 16, 2015

Court of Appeals Case No. 45A05-1410-JT-465

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

The Honorable Matthew B. Gruett, Referee

Cause Nos. 45D06-1308-JT-188, 45D06-1308-JT-189

**Brown, Judge**.

[1] J.P. ("Father") appeals the involuntary termination of his parental rights with respect to Mar.Y. and Mau.Y.[1] Father raises one issue, which we revise and restate as whether the evidence is sufficient to support the termination of his parental rights. We affirm.

*Facts and Procedural History*

[2] On September 13, 2012, Mar.Y., born in July 2005, and Mau.Y., born in October 2006 (together, the "Children") were removed from the care of T.Y. ("Mother").[2] On September 18, 2012, the trial court entered an order following the filing of petitions by the Indiana Department of Child Services ("DCS") alleging that each of the Children was a child in need of services ("CHINS").[3] The court ordered in part that the Children remain in the custody of DCS and that Father establish paternity.[4] In early November 2012, the court entered an order finding that Mother and Father admitted the material allegations in DCS's petitions and granting the petitions and finding that the Children were CHINS. The court also incorporated by reference a predispositional report and

---

[1] Father was ordered to establish paternity and did not do so.

[2] In its termination order, the trial court terminated the parental rights of Mother with respect to the Children and with respect to two other children who are not the children of Father. Mother does not participate in this appeal. The facts presented are those related to Father.

[3] The petitions related to the Children are not included in the record.

[4] In its termination order, the trial court found that the Children were placed in their current foster placement since October 2012. The other two children of Mother were placed with the same foster parent.

case plan which stated that the permanency plan for the Children was reunification and recommended in part that Father work with the prosecutor to establish paternity, complete a parenting assessment and follow all recommendations, complete a substance abuse assessment and follow all treatments and complete all recommendations, and submit to random drug and alcohol screens.

[3] On May 17, 2013, the court entered a permanency plan review hearing order which adopted a permanency plan of termination of parental rights with adoption. The court ordered in part that Father's visitation be stopped until his schedule was set and he could see the Children on a regular basis. On June 8 or June 10, 2013, Father was arrested and charged with dealing cocaine. A progress report on permanency filed by DCS dated July 23, 2013, stated that Father was incarcerated in the Lake County jail, had multiple charges, and had two court dates in August 2013.

[4] DCS filed verified petitions requesting the involuntary termination of the parent-child relationships between the Children and Father and Mother.[5] On July 10, 2014, Father was sentenced for dealing in cocaine or a narcotic drug as a class B felony to eleven years in the Department of Correction (the "DOC").

---

[5] As noted by DCS, Father's appendix does not include a copy of the chronological case summary or the termination petitions. According to DCS, the termination petitions were filed on August 8, 2013.

[5]     On September 3, 2014, the court held an evidentiary hearing on the termination petitions, and Father appeared telephonically and with counsel. Father testified that he never missed a court date besides the dates when he was incarcerated and he thought he completed all he was asked to do besides the paternity test. He testified he completed an evaluation at Geminus, he participated in visitation, he was not aware he had to take a paternity test until right before he was incarcerated and never had the chance to complete it, and that he had always agreed that the Children were his sons. He testified that he visited the Children "like once a week, besides [he] missed a few times because of work," he shopped for them, he enrolled them in a library program, and that he made sure his mother tried to visit them when she had a chance. Transcript at 21. Father indicated that he thought the last time he visited the Children was the week before he was incarcerated and that he sent them letters through their case worker but never received a response. He further testified that, during his incarceration, he completed a class in anger management and an eleven-session program called Freedom Bound, and enrolled in "inside, outside Fatherhood Admissions." *Id.* at 27.

[6]     Father also stated that he was arrested and charged with dealing cocaine in June 2013, he was not released and had remained in jail since that time, he was convicted of one count of dealing in cocaine or narcotic drug as a class B felony following a jury trial, he was sentenced to eleven years in the DOC on July 10, 2014, and that a DOC offender data sheet stated that his earliest possible release date is December 4, 2018. When asked if he felt he would have his sentence

reduced, Father stated: "It ain't a feel, I know." *Id.* at 37. When asked whether he was eligible to be released December 4, 2018, Father stated: "No. Good [] behavior, it could be up to 2016 or maybe even earlier. I'm going for appeal, so it could be sooner than that . . . ." *Id.* at 38. When asked "you're confident that you're going to have that sentence reduced, even though the Offender Data Sheet says . . . your earliest possible release date is . . . September of 2018," he said: "Yes." *Id.*

[7] Father testified that he pled guilty to carrying a handgun without a license as a class C felony in 2003 and that he had a conviction for possession of cocaine as a class D felony in 2007. When asked how much time he spent in prison or jail prior to his arrest in June 2013, he responded "probably like up to two years." *Id.* at 42. He stated that he was incarcerated after the Children were born in 2005 and 2006, and that he was in no position to provide for the Children because he was incarcerated. When asked when he committed the dealing crime for which he was arrested, his answer was that it occurred "[l]ike in the end of 2012." *Id.* at 47. When asked "[s]o the act that you were accused of and which you have been convicted of occurred after the kids were removed," Father responded "[y]es." *Id.*

[8] Mother testified: "when I met [Father], I know he was doing the drug stuff, and that's really what broke us up." *Id.* at 72. She indicated she had problems with domestic violence involving Father and testified "[h]e used to beat me in my eyes." *Id.* She stated that she left Father right after Mau.Y. was born, and that

the Children were made wards of DCS in 2012 and have been in foster care continuously since then.

[9] Amanda Cruse ("FCM Cruse"), a family case manager for DCS assigned to the Children, testified that the Children did not wish to return home, "[t]hey're very afraid," and that "[t]hey've stated that if they're sent home, they will run away." *Id.* at 116. When asked for her assessment as to whether Father can remedy the reason for the Children being placed outside of the home, FCM Cruse testified that the Children "did not talk about [Father] very much" and that "the biggest thing with [Father], of course, is incarceration at this point." *Id.* at 119. She stated that she recommended termination of parental rights and that termination and adoption were in the Children's best interests, saying "[t]hat is ultimately what the [C]hildren want" and "all the [C]hildren talk about is wanting to be adopted by their current foster mother and wanting to feel safe and secure in their home." *Id.* at 122-123. She testified that, when the Children were first placed with their foster mother, they had no sibling bond, "they broke things in the home, they threatened to kill each other, [and] they were having a lot of trouble." *Id.* at 123. She stated that the Children's foster mother has worked very hard with the Children and wishes to adopt them, the Children are in extracurricular activities and talk to each other now, Mau.Y. has the most severe problems, he "is very violent" and "steals a lot," and that he will continue with ongoing services. *Id.* at 124. She testified "[t]hey're going to continue family therapy as a sibling group as well, as they were very much had no feelings towards each other." *Id.* She stated that the situation is better,

the Children play together, and they actually say that they love each other. When asked about the reunification process, FCM Cruse testified the Children "do not want that." *Id.* at 125. She also indicated that the Children's foster mother is committed to making sure the Children receive services and to adopt them eventually. When asked whether the Children were ever asked about their thoughts and feelings related to Father, FCM Cruse testified the Children "never spoke [Father's] name, anything about him." *Id.* at 127.

[10] The Children's foster mother testified regarding the Children's progress over time, their school and extracurricular activities and grades, and their home and church activities. She stated that when Mau.Y. first arrived, he was unable to read and did not recognize letters and numbers, that she spoke with FCM Cruse and placed Mau.Y. in a class, and that she has spent a lot of time with him at home with numbers and learning words. She also indicated that she does not have regular communication with the Children's parents, she believed the parents' last visitation was in 2013, the behavior of the Children improved since visitation stopped, and that, if the court terminated the Children's parental rights, she would pursue adoption of them.

[11] On September 5, 2014, the court entered an order terminating the parental rights of Father and Mother. The court found that there is a reasonable probability that the conditions resulting in the removal of the Children from their parents' home will not be remedied, that Mother's relationship with Father was marked by incidents of domestic violence, it had been approximately two years since the Children were removed and no parent had

completed any case plan services towards reunification, and that the Children have remained in foster care since their original removal in September 2012.

[12] With respect to Father, the court found that he failed to establish paternity, he is currently incarcerated and was sentenced on July 10, 2014, to eleven years for dealing in cocaine, and that "[n]otwithstanding any pending appeals, [his] earliest possible release date is December 2018."[6]  Appellant's Appendix at iii. It found that Father has a lengthy criminal history dating back to 2003, he was convicted of felony possession of cocaine in 2007 for which he was also incarcerated, that despite his good intentions as a parent, he has voluntarily chosen to continue his engagement in criminal activities and, as such, remains incarcerated and unavailable as a caregiver to the Children.  The court found that Father has made an effort to participate in services both prior to and during his current incarceration, but it remains unknown whether he will have a sufficient residence or financial means upon his release from incarceration.  The court further found that Father has not had any visitation or contact with the Children since approximately June 2013, that the Children have not indicated any desire to communicate with Father, and that Father is in no position to parent the Children due to his incarceration.

[13] Among the court's other findings are that no parent was providing emotional or financial support, was or was likely to be in a position in the near future to

---

[6] On appeal, this court affirmed Father's conviction on March 31, 2015.

properly parent, or has completed the case plan towards reunification; that the Children have remained in their current foster placement since October 2012 and have demonstrated significant improvement in their academic performance, social interaction, and relationship development; and they have developed a significant bond with the current foster parent who is committed to adopting the Children as a sibling group. The court found there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children, that the Children deserve a loving, caring, safe, stable and drug free home, that it is in the best interests of the Children and their health, welfare, and future that the parent-child relationship between the Children and their parents be terminated, and that DCS has a satisfactory plan for the care and treatment of the Children which is adoption by the foster parent. The court terminated the parental rights of Father and Mother.

## Discussion

[14] The issue is whether the evidence is sufficient to support the termination of Father's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* When reviewing findings of fact and conclusions thereon in a case involving a termination of parental rights, we apply a two-tiered standard of review. *Id.* First, we determine whether the evidence supports the findings, and second whether the findings support the judgment. *Id.* We will

set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[15] This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.* A trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[16] In order to terminate a parent-child relationship, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2), *reh'g denied*. If the court finds that the allegations in a petition described in Ind. Code § 31-35-2-4 are true, the court shall terminate the parent-child relationship. *See* Ind. Code § 31-35-2-8(a).

A. *Remedy of Conditions*

[17] We note that the involuntary termination statute is written in the disjunctive and requires proof of only one of the circumstances listed in Ind. Code § 31-35-2-4(b)(2)(B). Because we find it to be dispositive under the facts of this case, we limit our review to whether DCS established that there was a reasonable probability that the conditions resulting in the removal or reasons for placement of the Children outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

[18] In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.* The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, but also those bases

resulting in the continued placement outside the home. *Id.* A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* A trial court can reasonably consider the services offered by DCS to the parent and the parent's response to those services. *Id.* Further, where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve. *Id.*

[19] Father contends that the record does not support the trial court's finding that there was a reasonable probability that the conditions resulting in removal would not be remedied, and argues that there is no nexus between his criminal history and his ability to parent the Children and that he had participated in meaningful services while incarcerated.

[20] The court's findings are supported by the evidence presented at the September 3, 2014 evidentiary hearing as set forth above. Father had a criminal history including two felony convictions and had been incarcerated prior to the Children's removal, he was arrested for dealing cocaine after the Children's removal by DCS, and he was subsequently convicted for the dealing leading to his incarceration until December 2018.

[21] Based upon the court's findings and the record, we conclude that clear and convincing evidence supports the trial court's determination that there was a

reasonable probability that the conditions leading to the Children's removal would not be remedied.[7]

B. *Best Interests and Satisfactory Plan*

[22] We next consider Father's assertion that DCS failed to demonstrate that termination of his parental rights was in the Children's best interests and his claim that DCS did not have a satisfactory plan for the care and treatment of the Children. He contends there was nothing substantive presented to show that a continued relationship with the Children would be detrimental to them and that, arguably, permanently severing him from the Children is not in their best interest. Father also argues that adoption is not a satisfactory case plan in that termination at this juncture is punitive as to him and could be detrimental to the well-being of the Children.

[23] We are mindful that in determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the DCS and to the totality of the evidence. *McBride,* 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court

---

[7] Father also cites to Ind. Code § 31-35-3-4, which provides that termination of an individual's parental rights may be sought if the individual is convicted of certain offenses, including murder, rape, child molesting, and incest. However, the statute is not the exclusive basis upon which a court may terminate an individual's parental rights. *See* Ind. Code §§ 31-35-2 (governing the termination of the parent-child relationship involving a delinquent child or a child in need of services). Father's incarceration and criminal history were proper factors for the trial court to consider in arriving at its determination. *See In re N.Q.*, 996 N.E.2d at 392 (noting a court may properly consider evidence of a parent's prior criminal history); *In re H.L.*, 915 N.E.2d 145, 150 (Ind. Ct. App. 2009) (considering in part the impact of incarceration on the parent's ability to provide for a child's care).

need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Children have a paramount need for permanency which the Indiana Supreme Court has called a central consideration in determining the child's best interests. *In re E.M.*, 4 N.E.3d 636, 647-648 (Ind. 2014). However, "focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry . . . ." *Id.* at 648. This court has previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1158-1159 (Ind. Ct. App. 2013), *trans. denied.* This court has previously recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied.*

[24] Further, this court has held that adoption is a satisfactory plan for the care and treatment of a child under the termination of parental rights statute. *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009) (citing *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). "This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated." *In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied.*

Based on the totality of the evidence in the record and set forth in the trial court's order, including Father's incarceration and criminal history, Mother's testimony regarding his drug use and domestic abuse, the improvement the Children have realized since their foster placement, and the recommendation of the DCS family case manager, we conclude that the court's determination that termination was in the Children's best interests is supported by clear and convincing evidence. The record also reveals that the court's findings support its conclusion that adoption is a satisfactory plan for the care and treatment of the Children. *See A.J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008) (concluding that, in light of the evidence, the plan for the adoption of the children was not unsatisfactory), *trans. denied*.

## Conclusion

We conclude that the trial court's judgment terminating the parental rights of Father is supported by clear and convincing evidence, and affirm.

Affirmed.

Crone, J., and Pyle, J., concur.